IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

FRANK ROMERO,

        Petitioner,

     v.

E. REYES,

        Respondent.

Case No. 2:22-cv-00675-JR

FINDINGS AND RECOMMENDATION

RUSSO, Magistrate Judge

    Petitioner, an adult in custody at the Two Rivers Correctional Institution, brings this 28 U.S.C. § 2254 habeas corpus action challenging his 2014 Marion County conviction for intentional murder. For the reasons that follow, the Petition for Writ of Habeas Corpus should be DENIED.

## BACKGROUND

    On April 6, 2013, at around 3:00 a.m., Salem police were dispatched to the intersection of Rees Hill Road and Fairway Avenue, after nearby residents reported hearing gunshots. Transcript, ECF No. 20 ("Tr."), pp. 144, 154.[1] Responding officers found a car embedded in blackberry bushes, its motor still running, the side windows shattered, and a deceased man who appeared to have crawled out of the driver side window after suffering several gunshot wounds. Tr. pp. 155-56, 159-60, 197. Investigators identified the deceased person as a west-side Salem 18th Street gang member, Andrew Entizne. Tr. 380. An autopsy revealed the victim had been

---

[1] The trial transcripts are sequentially numbered, so citations are to the transcript page number in the bottom right-hand corner of the pages.

1 – FINDINGS AND RECOMMENDATION

superficially wounded by shotgun pellets and killed by a .22 bullet that struck his aorta. Tr. p. 272.

Entizne had been released from prison approximately six months earlier after serving a sixteen-year sentence. Tr. p. 393. During his prison term, Entizne rose through the ranks of the prison "set" of the 18th Street Gang to become a top general, and according to police investigators was "the head honcho" in the prison. Tr. p. 393.

Petitioner was a long-time member of the east-side Salem 18th Street gang. Tr. p. 822. He rose through the ranks and for about ten years was the "number one" leader of the east-side set. Tr. p. 822. He had, however, eventually "handed the keys" to another gang member so he could assume a less active role in an "advisory position," which made him an "OG," or original gangster, which is a high status in the gang. Tr. pp. 776-77, 854, 860-61. By April 2013, petitioner had been a member of the gang for 28 years and was like a father figure to Pedro Suarez, his co-defendant who had been a member of the east side set for seven years. Tr. p. 517, 670.

Petitioner and Entizne had known each other since childhood but lost touch over the years and reconnected around the time of Entizne's release from prison. Tr. pp. 354, 519. Entizne stayed at petitioner's house regularly following his release. Tr. p. 834. By December 2012, tension developed between the two men because Entizne was attempting to take over leadership of both the East and West Side 18th Street sets in Salem, as he had done in prison. Tr. p. 727. Entizne was also dating petitioner's ex-girlfriend and told petitioner about sexual aspects of their relationship, which irritated petitioner. Tr. pp. 519-22.

In light of Entizne's behavior, petitioner decided to retaliate. Tr. p. 842. In January 2013, petitioner told Suarez there were plans to "check" Entizne. Tr. 679, 730. When a gang

2 – FINDINGS AND RECOMMENDATION

member is disrespectful to other members, and a member of higher ranking disapproves, the disrespecting gang member can be "checked," which could mean "hazed," "humiliated," or "getting beat up." Tr. p. 561. Two other 18th Street gang members, Rafael Maura, and Michael Roman, traveled to Salem from California and Arizona on April 5, 2013. Tr. pp. 335-37, 681-83. That afternoon, petitioner told Suarez that "it" was going to happen near petitioner's house, to "watch the road for cops and cars and to honk if any cars came by," and "if [he] heard shots to leave." Tr. pp. 687-92, 757.

On the evening of April 5 and early morning of April 6, petitioner and Entizne visited several bars and restaurants. Tr. p. 377. During that time, petitioner sent text messages to Suarez and Roman about the logistics of the impending check. Tr. pp. 617-19. After leaving the final bar together, Entizne gave petitioner a ride to petitioner's apartment and drove away from that apartment between 2:30 and 3:00 a.m. Tr. p. 378. As noted, Salem police responded to a shots fired call at about 3:00 a.m. and discovered Entizne deceased.

Another 18th Street gang member, Juan Contreras, testified that on the afternoon of April 7, 2013, the day after Entizne was murdered, Suarez drove Contreras to petitioner's home for a party. Tr. p. 541. Suarez told Contreras, "We did it," and "I shot him" because Entizne disrespected petitioner, Suarez, and the gang. Tr. pp. 542-43. Suarez also told Contreras he needed to "get rid of " the guns. Tr. p. 545. Photos recovered from Suarez's cell phone showed petitioner, Contreras, Maura, and Roman "throwing gang signs" and laughing at the party. Tr. p. 894.

On April 19, 2013, Suarez was arrested and charged. Tr. p. 402. After initially denying any involvement, Suarez ultimately admitted he had been involved in the shooting. Tr. p. 462. According to Suarez, he had not known Entizne was going to be killed. Tr. p. 476.

3 – FINDINGS AND RECOMMENDATION

Contreras also testified that a few weeks after the murder, he ran into petitioner, who told Contreras that Entizne was killed "because of a disagreement and a fight." Tr. p. 522. Contreras's impression from the conversation was that petitioner had "plotted" the murder, adding that petitioner said he left his house to give a gun to the people waiting in the car. Tr. p. 522. Petitioner told Contreras he was leaving town "because of his involvement" and fear related to "the fact of what had happened and who he did it to," referring to Entizne's friends. Tr. p. 551. Thereafter, petitioner left Oregon and moved to New Mexico. Tr. pp. 373-74.

On October 14, 2013, a Marion County grand jury indicted petitioner on charges of conspiracy to commit murder and intentional murder. Respondent's Exhibits Part A, ECF No. 17 ("Resp. Exh. Part A"), No. 102. Petitioner's case was joined with Suarez's for trial. Tr. p. 33. Police were unable to locate Maura or Roman before the trial. Tr. pp. 480-82.

The case was tried to a jury. At trial, petitioner testified he found out the gang planned to confront Entizne when two members came to his house and told him they wanted to "check" Entizne. Tr. pp. 838-39. The men said they could not find Entizne but knew he was always around petitioner's house, and therefore asked petitioner to identify a good spot to check Entizne. Tr. p. 887. Petitioner says he told the men either at the stop sign or at the park up the street near petitioner's house. Tr. p. 887.

Petitioner testified that "checking" is a process by which a gang member will "get talked to" and "put in their place." Tr. p. 827. He said the worse punishment is "just getting jumped for 18 seconds." Tr. pp. 827-28. He said he had never heard of a checking resulting in the killing of a gang member. Tr. p. 828. Petitioner maintained that although he thought a "check" was in order, he did not know the gang intended to kill Entizne. Tr. pp. 844-45. He believed killing the victim was not supposed to happen and that it was an accident. Tr. p. 876.

4 – FINDINGS AND RECOMMENDATION

The jury ultimately found petitioner guilty on both counts. Tr. p. 1015. The trial judge merged the guilty verdicts into a single conviction for intentional murder and imposed the mandatory minimum sentence of life with the possibility of parole after 25 years. Resp. Exh. Part A, No. 101.

Petitioner filed a direct appeal, challenging the sufficiency of the evidence. Resp. Exh. part A, No. 103. The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. *State v. Romero*, 276 Or. App. 226, *rev. denied*, 359 Or. 847 (2016).

Petitioner then filed a petition for state post-conviction relief ("PCR"), alleging that trial counsel provided ineffective assistance of counsel in four respects:

(a) Trial counsel failed to consult and call a gang expert to support petitioner's defense that he believed the victim was going to be checked, or beaten, but not killed.

(b) Trial counsel failed to interview and call petitioner's daughter to testify about petitioner's demeanor after the alleged murder.

(c) Trial counsel failed to object to the trial judge's son Daniel Day assisting the prosecution and failed to move for a mistrial when Day was identified to the jury as being the trial judge's son.

(d) Trial counsel failed to argue in closing that a lesser included offense of manslaughter or criminally negligent homicide was appropriate and fit the evidence more closely than murder.

Resp. Exh. Part A, No. 110. Following an evidentiary hearing, the PCR trial judge denied relief on the merits of all four claims in an extensive written judgment. Respondent's Exhibits, Part C, ECF No. 19 ("Resp. Exh. Part C), No. 135. On appeal, petitioner assigned error only to the PCR trial court's denial of the first and fourth claims. Resp. Exh. Part C, No. 136). The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. *Romero v. Bowser*, 312 Or. App. 557, *rev. denied*, 368 Or. 787 (2021).

5 – FINDINGS AND RECOMMENDATION

On May 6, 2022, petitioner filed his *pro se* Petition for Writ of Habeas Corpus in this Court. In it, he alleges four claims for relief. In Grounds One through Three, he alleges his trial counsel provided constitutionally ineffective assistance of counsel by failing to: (1) consult with and call a gang expert; (2) object to the presiding judge's son assisting the prosecution and move for a mistrial when the jury was told about the son's involvement in the trial; and (3) argue in closing in favor of a lesser included offense. In Ground Four, petitioner alleges that his PCR trial counsel was ineffective in various aspects.

Respondent contends petitioner fails to state a cognizable claim for relief in Ground Four, that he procedurally defaulted the claim alleged in Ground Two, and that the state PCR court decision denying relief on the claims alleged in Grounds One and Three is entitled to deference. This Court appointed counsel to represent petitioner, and in the counseled brief in support, petitioner addresses only the claims alleged in Grounds One and Three.

## LEGAL STANDARDS

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

6 – FINDINGS AND RECOMMENDATION

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant relief "if the state identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.  The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous.  *Id*. at 410.  Section 2254(d)(1) "preserves authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.  It goes no further."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

In assessing claims of ineffective assistance of counsel, the Court uses the general two-part test established by the Supreme Court.  *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009).  First, a petitioner must show that his counsel's performance fell below an objective standard of reasonableness.  *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).  Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id*. at 689.

Second, a petitioner must show that counsel's performance prejudiced the defense.  The appropriate test for prejudice is whether the petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial.  *Id*.

While the Supreme Court established in *Strickland* the legal principles that govern claims of ineffective assistance of counsel, it is not the role of the federal habeas court to evaluate whether counsel's performance fell below the *Strickland* standards   *Harrington*, 562 U.S. at 101.  Rather, when considering an ineffective assistance of counsel claim on federal habeas review,

"[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Id*. As the Supreme Court explained in *Harrington*, "[a] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id*.

## DISCUSSION

I.  **Ineffective Assistance for Failure to Call Expert Witness**

In Ground One, petitioner contends that trial counsel rendered constitutionally ineffective assistant of counsel by failing to consult with and call a gang expert as a witness at trial. Petitioner presented this claim to the PCR trial court, submitting an expert report from Dr. Jesse De La Cruz. Dr. De La Cruz opined that while "checks" are routine in gangs such as petitioner's, inter-gang assassinations, particularly for conduct like Entizne's, are exceedingly rare. Moreover, Dr. De La Cruz opined, the facts of this case, including the months of delay between Entizne's purported infraction and the discipline, support petitioner's testimony that he believed he was facilitating only a routine "check" on Entizne.

The PCR trial court reviewed De La Cruz's expert report and deposition testimony, and as an initial matter concluded that not all of his testimony would have been admissible at the criminal trial:

> I find the Dr. De La Cruz is qualified as an expert in the structure and behavior of Latino Gangs and the 18th Street Gang. His testimony is not scientific evidence in that it is not obtained through scientific methods. Despite his efforts to characterize it as scientific, it is not derived from science, mathematics and the like. His expertise is based on his training and research. Dr. De La Cruz would be qualified to testify regarding the structure and functioning of the 18th Street Gang generally. He would not be allowed to testify regarding the structure and functioning of the Salem, Oregon set of the 18th Street gang with any specificity because he testified that he did not know much about that gang. More importantly Dr. De La Cruz would not be permitted to analyze[] the evidence and offer his opinion on whether Petitioner was a "shot caller" for the Salem 18th Street Gang and would not be allowed to opine as to whether Petitioner had

8 – FINDINGS AND RECOMMENDATION

> motive to kill Mr. Entizne, that Petitioner did not know that Mr. Entizne was going to be murdered or intended for him to be murdered or whether this particular killing was gang authorized or "freelance." Those opinions would be beyond his expertise and beyond what an expert witness would be allowed to do at trial. In rendering those opinions, Dr. De La Cruz is evaluating and weighing the evidence and arguments made by the attorneys and supplanting the role of the jury. Only the portions of Dr. De La Cruz's testimony that would be admissible at trial can be considered in evaluating Petitioner's claims.

Resp. Exh. Part C, No. 135, pp. 5-6. The PCR trial court reached these conclusions based on the Oregon Evidence Code; as such, this Court cannot now re-examine them. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (an inquiry into state law "is no part of a federal court's habeas review of a state conviction"); *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993) (federal courts are "bound by a state court's construction of its own penal statutes").

The PCR trial court went on to find that petitioner's trial attorneys "failed to exercise reasonable professional skill and judgment in failing to retain a gang expert to evaluate Petitioner's case and testify at trial." Resp. Exh. Part C, No. 135, p. 6. The court found, however, that petitioner did not prove he was prejudiced by this failure:

> Petitioner has not proven that if Dr. De La Cruz had testified at trial, that his allowable testimony could have had a tendency to affect the outcome of the trial. It was undisputed, in fact Petitioner admitted at trial, that he arranged for the confrontation between Entizne and the men who killed him. The only issue was whether Petitioner intended for or knew that Entizne was going to be killed rather than "checked" or assaulted. He admitted that he selected the place for the encounter and that he worked with Suarez to set up the confrontation. Petitioner also communicated to Suarez when the event was to occur. He communicated with Suarez the night of the killing to let him know where he and Entizne were and when Entizne would be approaching the intersection. Petitioner was angry with Entizne and communicated that anger to other gang members. Juan Contreras testified that Petitioner admitted to him a few weeks after the murder that the victim had been killed because of a disagreement and fight and that Petitioner had supplied the weapons to Roman and Maura for the killing. After the killing, Suarez disposed of the weapons. There was evidence that when a friend called the next morning about the whereabouts of Entizne, Petitioner did not bother to call him, suggesting that Petitioner knew that Entizne was dead. The day after Entizne was murdered, Petitioner held a party at his house in which Suarez, Roman and Maura all attended. The fact that the two killers, Roman and

9 – FINDINGS AND RECOMMENDATION

> Maura who came to Oregon just before the murder, partied with Petitioner the day after the murder and then left soon thereafter would suggest that Petitioner was involved in the planning of and approved of the killing. It was not necessary for the state to prove that the killing was gang authorized rather than freelance. It did not have to prove that Petitioner was the top shot caller. It only had to prove that Petitioner conspired with the others and aided and abetted in the killing of Entizne. There was ample evidence to prove that Petitioner did in fact conspire with the others and aided and abetted the intentional murder of Entizne and the allowable testimony of Dr. De La Cruz would have done little if anything to convince the jury otherwise.

Resp. Exh. Part C, No. 135, pp. 6-7.

The PCR trial court's reasoning is well supported by the record and correctly applies the *Strickland* standard for determining prejudice. In light of all of the evidence and given the limitations on the admissibility of Dr. De La Cruz's opinions, the PCR trial judge's conclusion that the outcome of the trial would not have been different had trial counsel consulted with and called as a witness a gang expert was not objectively unreasonable and is entitled to deference in this Court. Accordingly, petitioner is not entitled to habeas corpus relief on his ineffective assistance of counsel claim alleged in Ground One.

## II.     Ineffective Assistance for Failure to Argue Lesser-Included Offenses

In Ground Three, petitioner alleges trial counsel was ineffective in failing to argue for lesser-included offenses in closing arguments. Trial counsel requested, and the trial court gave, jury instructions on the lesser-included offenses to murder of first- and second-degree manslaughter and criminally negligent homicide. Tr. 994-999. The jury verdict form also clearly identified those lesser-included offenses as being available to the jury. Resp. Exh. Part A, No. 106. In closing argument, however, trial counsel focused the argument solely on the defense strategy employed throughout the entire trial, *i.e.*, that an acquittal should be granted because petitioner did not know of or intend that Entizne be murdered.

10 – FINDINGS AND RECOMMENDATION

The PCR court rejected this claim of ineffective assistance, concluding that petitioner failed to satisfy either prong of the *Strickland* test:

> Petitioner did not prove that his trial attorney's [sic] failed to exercise reasonable professional skill and judgment in failing to argue for the lesser included charges of Manslaughter 1 & 2 or Criminally Negligent Homicide. The attorneys did request instructions on the lesser included offenses and the instructions were given by the court. The attorney's [sic], however, made a strategic decision to argue for acquittal rather than for a lesser-included conviction. This was consistent with the strategy agreed to by Petitioner and pursued by the attorneys. Trial counsel Howell gave the closing argument for petitioner. He did not argue for the lesser-included offenses. Neither did trial counsel for Suarez. Trial counsel Howell explained in his deposition that he had discussed the strategy for closing arguments with [co-counsel] Wells and that he argued "what I thought would apply to what came out at trial, to give [petitioner] the best chance for an acquittal." He explained that he watches to see how the jury reacts to his arguments and tries "to hit on the points that are most important." He believes that "the argument I gave, gave him the best chance of acquittal." Petitioner has not proven the strategy followed in arguing for acquittal in closing was unreasonable.
>
> Further, the Petitioner has not proven prejudice. The jurors had the instructions on the lesser-included offenses and are presumed to follow them. Additionally, the verdict form clearly provided the options for the jurors to find petitioner guilty of the lesser-included offenses. In fact, the verdict form even explained that the crimes were lesser-included offenses. Petitioner did not prove that the jury was unable to follow the instructions or ignored the options of the lesser-included offenses just because trial counsel did not argue for them in closing argument. Petitioner has not proven that his attorney's failure to argue for the lesser-included crimes could have had a tendency to affect the outcome of the trial.

Resp. Exh. Part C, No. 135, pp. 8-9.

The PCR trial court's determination was not unreasonable as petitioner has failed to show deficient performance by counsel or prejudice. Defense counsel's strategy throughout the trial, including closing argument, was to obtain a complete acquittal by convincing the jury that petitioner did not intend Entizne to be killed. Counsel was not deficient as the attempt to obtain a complete acquittal was a reasonable, tactical decision under the circumstances. *See Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984) (rejecting ineffective assistance claim where counsel

11 – FINDINGS AND RECOMMENDATION

made a reasoned, tactical decision to forego a negligent homicide instruction in an attempt to obtain an outright acquittal).

Petitioner also failed to establish prejudice resulting from counsel's failure to address the lesser-included offenses in closing argument. Under Oregon law, the jury must consider the charged offense and any lesser-included offenses "in order of seriousness." Or. Rev. Stat. § 136.460(2). The trial court so instructed the jury. Tr. pp. 994-95. In considering the effect of any argument counsel could have made, this Court must presume the jury did follow the "acquittal first" instruction. *Strickland*, 466 U.S. at 694-95 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision"). Once the jury found petitioner guilty of intentional murder, deliberations on the homicide were at an end. Petitioner cannot establish, therefore, that the jury would even have considered the lesser-included offenses if counsel had argued differently in closing, let alone that they would have found petitioner guilty of one of those offenses. Accordingly, petitioner is not entitled to habeas corpus relief on the claim alleged in Ground Three.

### III. Claims Not Addressed by Petitioner

In Ground Two, petitioner alleges his trial counsel provided ineffective assistance of counsel by failing to call petitioner's daughter as a witness, and in Ground Four he alleges PCR trial counsel provided ineffective assistance in failing to pursue certain claims. As noted, however, petitioner does not address these claims in his briefing to the Court. Therefore, petitioner has not sustained his burden to demonstrate why he is entitled to relief on these claims. *See Lambert v. Blodgett*, 393 F.3d 943, 970 n. 16 (9th Cir. 2004). Nevertheless, the Court has reviewed the claims and is satisfied that petitioner is not entitled to habeas corpus relief.

Petitioner procedurally defaulted his claim of ineffective assistance based on the failure to call his daughter as a witness, and there is no basis upon which to excuse his procedural default. Moreover, claims of ineffective assistance of PCR counsel are not cognizable in habeas corpus. Accordingly, petitioner is not entitled to habeas relief on the claims alleged in Grounds Two and Four.

## CONCLUSION

For the reasons stated above, the Court should deny the Petition for Writ of Habeas Corpus and should enter a judgment dismissing this action and denying a certificate of appealability. This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. The parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered as a waiver of a party's right to *de novo* consideration of the factual issues and will constitute a

waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this   13th   day of August 2024.

                                                      /s/ Jolie Russo
                                              Jolie A. Russo
                                              United States Magistrate Judge